IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| JAMIE LYNN DOBYNS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No: 09 C 0160 |
| v. | ) | |
| | ) | Magistrate Judge Jeffrey Cole |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Jamie Lynn Dobyns, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). 42 U.S.C. §§ 423(d)(2). Ms. Dobyns asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.[1]

---

[1] The Commissioner is responsible for filing a certified copy of the Administrative Record as part of his answer. 42 U.S.C. § 405(g). It is as though the Commissioner has farmed this chore out to local casino boat dealers, because the record in this case is a shuffled deck, a complete jumble, with a significant portion of the pages out of sequence. If that were not bad enough, the record is perhaps730 pages long – perhaps, because as the pages numbers can't really be trusted, there may be pages 731-800 interspersed throughout the record. So, while the parties provide page references to certain pieces of evidence in their briefs, it serves little use when a typical page sequence in the record is 272, 301-308, 295-300, 287-294, 309, or 139, 130-134, 124-129, 118-123, and so on. As it is, it borders upon rendering the ALJ's decision unreviewable, which would arguably warrant a remand. *See Hollon ex rel. Hollon v. Commissioner of Social Sec.*, 447 F.3d 477, 484 n.8 (6th Cir. 2006).

# I.
## PROCEDURAL HISTORY

In her application for DIB, Ms. Dobyns alleged that she had become disabled on July 11, 2005, when she underwent spinal fusion surgery. (Administrative Record ("R.") 32). Her application was denied initially and upon reconsideration. (R. 133-37, 139-41, 147-50). Ms. Dobyns continued pursuit of her claim by filing a timely request for hearing.

An administrative law judge ("ALJ") convened a hearing on February 7, 2007, at which Ms. Allen, represented by counsel, appeared and testified. (R. 43-115).[2] In addition, Dr. William Newman testified as a medical expert, and Lee Ann Kehr testified as a vocational expert. (R. 43). On February 27, 2007, the ALJ issued a decision finding Ms. Dobyns disabled from July 11, 2005, until August 31, 2006. As of that date, the ALJ found that Ms. Allen could perform her past work as a secretary, receiving clerk, or teacher's aid. (R. 39). This became the final decision of the Commissioner when the Appeals Council denied Ms. Dobyns' request for review of the decision – which she supported with additional medical evidence the ALJ had not considered – on November 13, 2008. (R. 1-3). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Dobyns has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

---

[2] Throughout the record the hearing is alternatively said to have been February 7th or February 27th (R. 32, 43, 45, 115, 85, 161), sometimes on the same page. (R. 45). It is assumed to be February 7th, given the date of the ALJ's decision.

## II.
## EVIDENCE OF RECORD

### A.
### Vocational Evidence

Ms. Dobyns was born on August 16, 1965, making her forty-one years old at the time of the ALJ's decision. (R. 50). She has a GED, completed a nine-month course in data entry at a technical school, and has taken a couple of college courses. (R. 49). She has worked as a secretary, a special education teacher's aid, an exotic dancer, a swimming instructor, and an aerobics instructor. (R. 206-205).[3] She last worked on October 8, 2006, as a special education teacher's assistant. (R. 47). She could no longer tolerate sitting at the computer due to the pain in her back, neck, wrists, and hands. (R. 48).

### B.
### Medical Evidence

Ms. Dobyns' medical record depicts her as suffering from one chronic orthopedic ailment after another: disc problems in her back with pain radiating down her left leg, for which she has undergone spinal fusion; similar difficulties in her neck, with pain radiating down her arms; impairments in her feet; and trouble in her arms wrists and hands. She also suffers from sleep apnea and has recurrent lymph node problems, for which she has undergone at least one lymphadenectomy.

Her back impairment seemed to originate at the L5-S1 section of her lumbosacral spine, where an MRI revealed spondylosis, generalized bulging disc, plate spurring, and

---

[3] This is not a typographical error: Ms. Dobyns's nine-page work history is sandwiched between pages 206 and 205 in the shuffled record.

3

foraminal narrowing as early as September 2002. (R. 347). Ms. Dobyns was treated conservatively until the situation deteriorated badly. By May of 2005, there was "[q]uestionable internal development of clumping of the nerve sac," which could possibly have been arachnoiditis. There had been some disc bulge improvement, but a synovial cyst had developed, and foraminal narrowing remained. (R. 306-07). A discography in June of 2005 revealed the disc at L4-L5 to be internally disrupted with a small radial tear. The disc at L5-S1 was also internally disrupted and, unlike the L4-L5 problem, there was "significant concordant pain to a level of 8/10." (R. 522).

On July 11, 2005, Ms. Dobyns underwent a spinal fusion at L5-S1. (R. 572). Afterwards, she had to wear a back brace and there were medical restrictions on her activities, including sitting. (R. 480). Ms. Dobyns began asking her doctor about a return to work in February 2006, but her job in special education required her to lift children of up to 150 pounds at times. (R. 689). As of March 2006, her doctor would still not release her for work, indicating that she would be totally disabled for an indeterminate period. (R. 679). By April, there was overall reduction in her back pain. (R. 675). Although Ms. Dobyns consistently attended her back physical therapy sessions, she was said to be noncompliant when it came to her shoulder, knee, and neck pain. (R. 673).[4] Ms. Dobyns felt well enough in June 2006 to go to an amusement park – with her doctor's blessing – and ride the rides. (R. 671). In August of 2006, she reported that she was doing quite well and no longer using pain medication for her back. (R. 670). But,s

---

[4] Ms. Dobyns' trouble with keeping up with her physical therapy appointments seem to have been primarily a product of insurance problems, as well as trying to hold down her job as a teacher's assistant. (R. 85-86).

by October 2006, acute flare-ups of pain in her back had returned. (R. 669). The deficit at L4-5 had remained unchanged, and her doctor said "activity modification" was needed until "she could see her way over this." (R. 669).

Moreover, following her spinal fusion, her problems seemed to migrate to her neck, and she began suffering pain in her cervical spine that radiated to her shoulders. (R. 480). In September of 2005, there was some reduction in her cervical range of motion and in the strength of her left arm. (R. 508). An MRI of her cervical spine revealed mild spondylotic changes at the C4-5 level in October of 2005. (R. 506). There was mild narrowing of the spinal canal at C4-5, along with an osteophyte complex. (R. 506). There was also a broad-based osteophyte complex at C5-6, as well as mild central spinal canal narrowing. (R. 506). In March of 2006, an MRI of the neck was said to reveal disc herniation at the C4-5, C5-6, C6-7 levels. Examination revealed a slightly reduced range of motion in her cervical spine, and continued reduced strength in her left arm due to multiple involvement of the cervical spine and shoulder. (R. 680-81). Physical therapy was recommended. (R. 681-82).

Then there was Ms. Dobyns' left knee. She had arthroscopic surgery on that in February of 2006. (R. 684, 688). She was prescribed a course of physical therapy after surgery. (R. 686). Her pain continued through at least September 2006, and she continued taking a prescription pain killer, Norco. (R. 709).

Ms. Dobyns also had surgery on her left foot; a screw was implanted between her heel and ankle. (R. 668). She began experiencing left foot and ankle pain in March of 2006. (R. 676, 678). An MRI that April was unremarkable, aside from fluid build-up

indicative of inflammation (R. 694), and the pain was thought to be related to her flat-footedness. (R. 672). She felt better initially following surgery, but later began to feel quite a bit of pain; this continued into November 2006. At that time, sensory examination was normal, but there was pain upon palpation and range of motion evaluation. (R. 668).

Ms. Dobyns also began having problems with her hands and wrists; additional problems that did not appear to radiate from her cervical spine. An MRI of both of Ms. Dobyns' wrists in February of 2006 was consistent with synovitis. (R. 698).

After the ALJ's decision, Ms. Dobyns submitted opinions from her treating physicians. On February 28, 2007, one of Ms. Dobyns' treating physicians, Dr. James Wilson, completed a questionnaire regarding her physical capacity. He had been treating her since 2003. He noted that her pain level varied from 6 to 10, and was precipitated by prolonged time in one position. (R. 276). She also experienced dizziness, fatigue, confusion, forgetfulness, and nausea, some of which were brought on by her pain medications. (R. 276). Over the years, of course, Ms. Dobyns has taken a host of prescription medications to combat an array of difficulties. (R.690-92). Most recently, she was taking Norco, a narcotic for pain; Allegra for allergies; Naproxen, an anti-inflammatory; Welbutrin, for depression; and Nexium for acid reflux. (R. 289). Dr. Wilson also felt that Ms. Dobyns' symptoms were exacerbated by her depression. (R. 277). He symptoms would interfere constantly with her ability to work. (R. 277). He though she could sit for about 20 minutes, stand for 10, and sit or stand/walk for a total of two hours in an 8-hour workday. (R. 277-78). She needed to walk around for about 10-

15 minutes every 90 minutes. (R. 278). She needed 10-20 breaks each day. (R. 278). Dr. Wilson felt Ms. Dobyns could frequently lift less than 10 pounds. (R. 278). Ms. Dobyns also had significant limitations with gross and fine manipulation of her hands. (R. 279). He thought she was incapable of performing even a low-stress job. (R. 277, 279).

Another of Ms. Dobyns' treating physicians, Dr. Spangenberg, provided a similar report on March 15, 2007. Dr. Spangenberg went over the litany of medical problems, treatments, and surgeries Ms. Dobyns had had. (R. 293-94). She also listed the various specialists that Ms. Dobyns saw – for her lymphatic problems, spinal problems, internal ailments, respiratory troubles, pain management, etc. (R. 294). There was significant pain from her back and neck impairments and frequent migraines. Her sleep apnea had not been successfully treated and left her with chronic fatigue. Ms. Dobyns also suffered from neuromas and bursitis in her feet with attendant nerve damage, not to mention bunions and hammertoes. (R. 294). Dr. Spangenberg felt that Ms. Dobyns was disabled due to her "chronic recurrent medical problems." (R. 295).[5]

Dr. Mary Ling, who had treated Ms. Dobyns for wrist pain, submitted an opinion dated February 20, 2007 (R. 290-92), which was in turn submitted following the ALJ's decision. She treated Ms. Dobyns for hand and wrist pain in both upper extremities, and noted that there was pain, tenderness, and soft tissue swelling. (R. 291). Pain radiated from the wrist to the thumb, more so on the left side. (R. 291). Ms. Dobyns had significant limitations reaching, handling, or manipulating. (R. 292).

---

[5] Owing to the state of the record, page 295 appears 12 pages before 294, and just after page 308.

These reports do not enter into the calculus, however. Generally, the court does not review the decision of the Appeals Council to deny review of an ALJ's disability determination. *Damato v. Sullivan*, 945 F.2d 982, 988-89 (7th Cir.1991). If the Appeals Council denies review, the decision of the ALJ becomes the final decision of the Commissioner and it is that decision that is subject to judicial review. *Id.* If the Appeals Council's decision to deny review is based on a legal error, however, the court can consider the denial of review. *Eads v. Sec'y of the Dept. of Heath & Human Srvs*, 983 F.2d 815, 817 (7th Cir.1993). One example of that might be where evidence is submitted for the first time to the Appellate Council and the Council decides that the evidence "was not 'new' or 'material' within the meaning of the governing rules." *Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir.1997). But that's not what happened here. The Appeals Council simply stated that the evidence "d[id] not provide a basis for changing the Administrative Law Judge's decision." (R. 2). The Appeals Council did not have to provide a reason. *Damato*, 945 F.2d at 989 ("[T]he Appeals Council may deny review without articulating its reasoning."). In any case, it is not an argument that Ms. Dobyns raised, so it is waived.

## C.
### Administrative Hearing Testimony

#### 1.
#### Plaintiff's Testimony

At the hearing, Ms. Dobyns testified that she last worked on October 8, 2006. She was a special education teacher's assistant. (R. 47). She had done that sporadically since 2004. (R. 48). She did not work at all from the time of her spinal fusion surgery in

July of 2005, until May of 2006. (R. 81). The school year ended in June. (R. 83). She tried to teach summer school but couldn't because then she needed foot surgery. (R. 84). She returned to work at the end of August and made it to the beginning of October before she could no longer tolerate the sitting at the computer or the lifting of children or doing things on the floor with the children. (R. 85). Her frequent medical appointments also made it difficult to maintain the job. (R. 85).

Ms. Dobyns said she could sit for about twenty minutes before she had to get up. Her sitting was limited by her spinal fusion and her knee surgery, and the pain that radiated down her left leg. (R. 51). Standing was the same: about twenty minutes before she experienced pain and discomfort. (R. 51). Basically, she had to alternate between sitting and standing. (R. 51). She did so at the hearing. (R. 63). Ms. Dobyns thought she could walk for about thirty minutes. (R. 54). She didn't think she could go a whole work day alternating among sitting, standing, and walking because she often had to lie down as her back became tired. (R. 55). This was essentially why she ceased her teaching assistant position; she began having a lot of trouble making it through the days, even though she could alternate among sitting, standing, and walking. (R. 55).

Ms. Dobyns said she could only lift her left arm about half way; her right arm was fine. (R. 57). She knew she could lift ten pounds because she was able to hold her grandson was he was born. (R. 57). She thought she might be able to carry five pounds. (R. 58). She experienced discomfort when she walked due to various problems in her feet. (R. 59-60). Ms. Dobyns took various medications for her problems – pain medications, muscle relaxants, and antidepressants – and it left her foggy and made it

9

difficult to concentrate. (R. 61). She also testified as to her sleep apnea. She had tried several things: from CPAP machines to uvuloplasty surgery, without success. (R. 53).

**2.**

**Vocational Expert's Testimony**

Lee Ann Kehr then testified as a vocational expert. She said that Ms. Dobyns had worked in a variety of secretarial positions that were sedentary and semi-skilled. (R. 68-69). As for her recent special education teacher's assistant job, the Dictionary of Occupational Titles classified it as light or medium work (R. 69, 70), but it was heavy work the way Ms. Dobyns was required to perform it. (R. 69). The VE said Ms. Dobyns also had held a regular teacher's assistant position longer ago that was sedentary work. (R. 69). Both were semi-skilled. (R. 69). But Ms. Dobyns indicated that her only teacher's assistant jobs had been in special education. (R. 71).

Her jobs as personal trainer were classified as medium, although they were heavy the way she had to perform them. (R. 70). The dancing jobs fell under the heavy work classification. (R. 70).

The ALJ asked the VE to consider the following limitations: lifting and carrying of no more than ten pounds, standing and walking and sitting alternately with normal breaks for six hours out of a day and additionally every ninety minutes the option to walk for five minutes and return to sitting, unlimited ability to push and pull, occasional crouching and squatting, unlimited ability to perform gross and fine manipulations, and interruptions in concentration or attention —"off task" for a "cumulative" of five minutes per hour per day due to pain. (R. 110). The VE testified that such limitations would

allow a person to perform the bulk of secretarial positions Ms. Dobyns had held, and the teacher assistant job where she did computer work and dealt one-on-one with autistic children. (R. 110). When questioned by Ms. Dobyns' attorney, the VE said that if Ms. Dobyns could only sit or stand for twenty minutes at a time, it might affect "some of the secretarial positions," but wouldn't affect the receptionist position "as much." (R. 111). She could still perform the special education teacher's assistant job. (R. 111). Finally, if Ms. Dobyns were unable to perform fine and gross manipulations more than occasionally, she would be precluded from all work. (R. 112). Additionally, the VE said that the most a person could be off task in a day was nine minutes per hour. (R. 113).

### 3.
### Medical Expert's Testimony

After reviewing Ms. Dobyns' medical record, Dr. William Newman testified. He noted that Ms. Dobyns underwent spinal fusion surgery and also had a tear in her disc at L4. (R. 88). He said that the fusion would put extra strain on this area. (R. 89-91). This might explain continued neurological deficits associated with her back like leg pain or neck pain. (R. 91). He felt that her physician ought to have restricted her activities more than he did; Dr. Newman would not have allowed her to go to an amusement park, for example. (R. 91). Dr. Newman indicated that the residual symptoms that Ms. Dobyns alleged could be a result of the tear above the site of the spinal fusion. (R. 91). Even after her fusion healed, she would not be able to lift anything more than fifteen or twenty pounds. (R. 92).

Dr. Williams then discussed Ms. Dobyns' neck problems, noting that she had two protruding discs there. (R. 92). They might be the cause of her left arm trouble, and were severe enough to require epidurals. (R. 92). Dr. Newman didn't think the pain in her neck would "be forever disabling." (R. 93). On the other hand, he noted that an MRI did reveal that her condition had worsened went she went back to work. (R. 93). Dr. Newman also acknowledged that Ms. Dobyns had had knee, foot, and ankle surgery. (R. 94). An MRI also revealed that Ms. Dobyns suffered from tibial tendonitis. (R. 95).

The doctor felt Ms. Dobyns' major disabling pathology was her lumbar spine, and that it equaled listing 1.04(A) in the Listing of Impairments. (R. 99). While it wasn't entirely clear from the ALJ's line of questioning – he confused 2005 with 2006 and interrupted Dr, Newman's conclusions at times – it would seem that Dr. Newman indicated that this condition would no longer meet the listings as of July 30, 2006. (R. 98-99).

Then, Dr. Newman added that Ms. Dobyns' neck was a problem as well, and painful, but it was "going to be temporary . . . Should go away by itself." (R. 99). The problems with her feet would limit her to sedentary work. (R. 99). Later, Dr. Newman also opined that Ms. Dobyns' neck pain would be "annoying . . . but shouldn't prevent her from doing work with those restrictions." (R. 100). He also said that the discs in her neck had degenerated and weakened, and that physical therapy would not relieve this condition. (R. 100). As he remarked to the ALJ: "Neck pain can be very annoying. It's also extremely common. Pain in the neck." (R. 102). Later still, he noted that the tenosynovitis in her wrists would cause additional pain as well (R. 102), but it was not a

major disabling thing. (R. 105). Nor was her pain in her shoulder; that would only bother her when lifting, which would not preclude sedentary work. (R. 106). But, he added that, in a sedentary job, she would have to get up and walk around every hour or so for about five minutes. (R. 119).

### D.
### The ALJ's Decision

The ALJ found that Ms. Dobyns suffered from degenerative disc disease and degenerative joint disease. (R. 35). These were both severe impairments as defined by the regulations. (R. 35). The ALJ mistakenly noted that Ms. Dobyns had a cervical fusion in July of 2005. (R. 36). He did not consider Ms. Dobyns' foot problem to be a severe impairment, nor her depression. (R. 36). The ALJ further found that, from July 11, 2005, through August 30, 2006, Ms. Dobyns' impairments medically equaled the criteria of the Listing of Impairments § 1.04(A), covering disorders of the spine. (R. 37). He explained that he was adopting Dr. Newman's opinion. (R. 37).

Thereafter, however, the ALJ determined that Ms. Dobyns' condition improved medically, and as of August 31, 2006, she no longer met the criteria of listing 1.04, and her disability ended. (R. 37). The ALJ noted that:

> On June 7, 2006, the claimant reported her back was feeling fine. During an evaluation on September 13, 2006, it was noted that the claimant was in no acute distress. An x-ray of the lumbar spine taken August 18, 2006, showed a solid anterior interbody fusion at the L5-S1 level. On October 25, 2006, normal motor strength was seen. Reflexes were 2+ and symmetrical throughout. Sitting straight leg raise was negative.

13

(R. 37). The ALJ then reviewed the medical evidence regarding Ms. Dobyn's many orthopedic impairments. (R. 38). He reiterated that she no longer met the listings. (R. 39).

Next, the ALJ determined what level of work Ms. Dobyns could perform as of August 31, 2006. He felt that as of that date, Ms. Dobyns' impairment could reasonably be expected to produce her alleged symptoms, but that her allegations as to their level, persistence and limiting effects were not entirely credible. (R. 40). The ALJ said that on numerous visits to the doctor, Ms. Dobyns did not mention her back or foot pain. (R. 40). He found her sleep apnea was well-controlled. (R. 40). He said he considered her daily activities and side effects of her medications, although he did not mention any. (R. 40). He further noted that:

> on September 9, 2006, there was no evaluation of the musculoskeletal system at all, not did the claimant present with any complaints of back or neck pain. On examination, December 18, 2006, she had a full range of motion in her neck along with tenderness on the posterior, slightly to the left. She was able to rotate, flex, and extend the neck.

(R. 41).

The ALJ stated that he considered all the medical opinion evidence in the record, although, again, he made no mention of any of them. (R. 41). He determined that Ms. Dobyns had "the residual functional capacity to lift and/or carry up to, but no more than, 10 pounds, sit, stand, and walk for 6 hours in an 8-hour workday and her ability to push/pull is unlimited. Other limitations include: occasional climbing of ramps and/or stairs, balancing, stooping, kneeling, and no climbing of ropes, scaffolds, or ladders, no crawling; and no concentrated exposure to extreme cold/heat, or vibrations. (R. 39). He

14

then indicated that he found the VE's testimony reliable, and concluded that Ms. Dobyns' past work as a secretary, receiving clerk, and/or teacher's aid as it was actually performed did not exceed any of these limitations. (R. 41). As a result, he concluded that Ms. Dobyns was not disabled as of August 31, 2006. (R. 41-42).

## IV.
## DISCUSSION

### A.
### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

## B.
### Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
### Analysis

Ms. Dobyns submits that there are a couple of flaws in the ALJ's decision. The one that stands out, however, has to do with the ALJ's credibility determination. It fell short of the analysis required by the law, the regulations, and the applicable Social Security Ruling (S.S.R.). That, alone, necessitates a remand in this case.

An ALJ's credibility finding is afforded "considerable deference" and will overturn it only if "patently wrong," *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir.2006), but it must be supported with an adequate rationale. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir.2009). When assessing a claimant's credibility, an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms,

aggravating factors, medication, treatment, and limitations, *and* justify the finding with specific reasons supported by the record. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); 20 C.F.R. § 404.1529(c); S.S.R. 96-7p.

Here, the ALJ cited all the required factors, but failed to address them. That is not sufficient. *Arnold v. Barnhart*, 473 F.3d 816, 82223 (7th Cir. 2007); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir.2001). He did not discuss Ms. Dobyns' daily activities. He didn't really get into this line of questioning with her at the hearing, although she did mention that she had to change positions frequently during the day – every twenty minutes or so – and had to spend a fair amount of time lying down. Her written statement as to her daily activities depicts her as significantly limited. She can't open jars and has difficulty writing. She has difficulty attending to hygiene. She is unable to do a number of household chores. She can't reach up to put away dishes. She doesn't go to movies or restaurants because she can't sit for very long. She does no yard work. And so on. (R. 219-221).

The ALJ didn't mention any of this in his decision. He simply stated that he was required to consider it, and that he "made every reasonable effort to obtain available information that could shed light on the credibility of the claimant's statements regarding the nature and severity of her impairment(s) as relates to her activities of daily living . . . ." (R. 40). That doesn't indicate he considered them and, as he did not mention any of Ms. Dobyns' daily activities, it tends to suggest he *didn't* consider them because his "reasonable efforts" were unsuccessful. That makes his analysis insufficient. An ALJ

cannot disregard a claimant's limitations in performing household activities. *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *See Craft v. Astrue*, 539 F.3d at 668, 680 (7th Cir. 2006); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir.2006). And even if a claimant is able to attend to a smattering of household tasks, that does not equate to an ability to hold a job outside the home. *See Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006)(collecting cases).

Moreover, while the ALJ said he adopted the ME's testimony, he failed to acknowledge the points where the ME said that Ms. Dobyns' alleged symptoms were concomitant – or could be –with her various medical problems, especially those of her lower back and neck. Her neck problems would cause attendant limitations in her arms and hands. While the ME said this would not "be forever disabling," that seems to suggest it is disabling now; for a period after the closed period. At the very least, such testimony from the ME ought to have focused the ALJ's attention on Ms. Dobyns' testimony or her statement as to the many things she could no longer do.[6]

Similarly, the ALJ did not discuss Ms. Dobyns' many medications or their side effects. Ms. Dobyns has been on a veritable pharmacy of medication for the past few years. These include narcotics such as Vicodin and Narco, which produce drowsiness in isolation and perhaps adversely affect concentration; they may react with the several other drugs she is taking as well. *See Green v. Apfel*, 204 F.3d 780, 781 (7th Cir.2000)

---

[6] The ME's testimony was problematic in this area. He apparently felt that Ms. Dobyns' cervical impairments were disabling after the closed period, but he thought they would go away. At the same time, he seemed to suggest that because degenerated and weakened cervical discs were common, they shouldn't prevent Ms. Dobyns from working. It's not clear one thing follows the other, however.

("... heavy painkillers often have serious side effects ...."). She noted her drowsiness and forgetfulness in her application statement, but the ALJ did not question her about the effects of her medications at the hearing. But even beyond the side effects of the medications, Ms. Dobyns pursuit of treatment for, and relief from, pain, is the type of thing that lends credence to a claimant's credibility. Strong painkillers, epidurals, and spinal fusions – not to mention regularly visiting a team of physicians – must be regarded in an assessment the truthfulness of a claimant's allegations. *See Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004).

The ALJ focused on the fact that at a few doctor's appointments in late 2006, Ms. Dobyns failed to complain about the pain in her back or her feet. However, on the occasions the ALJ apparently had in mind,[7] Ms. Dobyns was seeking treatment for a skin infection, a vocal cord lesion, swollen glands, and a sinus infection. (R. 645, 648, 651), It's not out of the ordinary that she'd ignore her orthopedic problems during those sessions – apparently with her family doctor – especially when she was seeing other specializing physicians for treatment of those impairments. *Cf. Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995)("... there is no reason to expect a doctor asked about an eye problem, or a back pain, or an infection of the urinary tract to diagnose depression."). Moreover, these were a few pages of a voluminous medical record and fairly isolated instances of good health. "A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have

---

[7] The ALJ simply referenced a compendium of notes from a doctor, such as "Medical Notes from Dr. Katherine Spangenberg", which is not particularly helpful given a 700-page record where the evidence is not in chronological order, not to mention the pages not being in order.

*better days and worse days . . . ."* *Bauer*, 532 F.3d at 609. In either respect, these few reports aren't sufficient reason to discredit Ms. Dobyns' testimony, especially when the ALJ failed to consider the required relevant factors.

Accordingly, this case must be remanded because the ALJ failed to build the required "logical bridge" between the evidence and his conclusion. There is often difficulty in applying this standard. Where one judge sees a bridge, another may see unfordable rapids. But here, the claimant has presented evidence of a constellation of orthopedic impairments, affecting several areas of her body. Even the ME said that they could be expected to produce the types of symptoms she alleges. So maybe a foot impairment precludes walking and a back impairment precludes lifting, but then neck and hand and wrist impairments enter into the equation, or ought to, when the only thing left is sedentary work. The VE testified that if Ms. Dobyns' allegations that she had to change positions every twenty minutes, as opposed to every hour or hour and a half were credited, this would "affect" the secretarial positions she held, leaving the regular teacher's assistant position –a job Ms. Dobyns said she never held. Credibility, then, is a key issue here – not that it isn't generally – and one that affects the remainder of the ALJ's findings.

## CONCLUSION

The plaintiff's motion for summary judgment or remand is GRANTED, and the Commissioner's motion for summary judgment is DENIED.

9/24/2010                    ENTERED:_____

UNITED STATES MAGISTRATE JUDGE